494 S.E.2d 630

**Alphonso SMITH, Claimant, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF MENTAL HEALTH, Employer, and State Workers' Compensation Fund, Insurer, Respondents.**

No. 2755.

Court of Appeals of South Carolina.

Heard Oct. 8, 1997

Decided Nov. 24, 1997.

Rehearing Denied Jan. 22, 1998.

486

Preston F. McDaniel, Columbia, for appellant.

Ajerenal Danley, and Rose Mary McGregor, Columbia, for respondents.

HOWELL, Chief Judge:

Alphonso Smith appeals from the circuit court's affirmance of the decision of the Workers' Compensation Commission finding that he suffered a 12% permanent disability to his spine and allowing his employer, the South Carolina Department of Mental Health (DMH), to stop payment of his temporary benefits. We affirm in part, reverse in part, and remand.

I.

In 1975, when he was still in high school, Smith was categorized as "educable retarded," with a full scale I.Q. of 64. The record, however, reveals that Smith giggled and flirted with the examiner during the tests, and that Smith seemed to think that taking tests was a game. Accordingly, the examiner believed that "[t]he results of the tests are probably a minimal estimate of the boy's abilities, but at the same time reflect how he functions in the classroom." The testing indicated that Smith read at a third-grade level, and that he recognized only a few simple words.

Smith, who was 35 years old at the time of the hearing before the single commissioner, began working for DMH in 1977. Smith initially was a "trades worker" for DMH, which involved manual labor, primarily heavy construction work.

Smith injured his back at work in May and July of 1989. From the date of these injuries through early 1992,[1] Smith

---

1. During this period, Smith twice was terminated and then reinstated through the grievance procedure. Both terminations resulted from, at

was in and out of work, and was released by various doctors at various times as being capable of performing his regular work duties or as being capable of performing only light-duty work.

Smith was treated by Dr. Bell in the summer of 1989. In July, Dr. Bell concluded that Smith was physically able to return to work. In August 1989, Smith was examined by Dr. Bethea, who released him for work, finding that he suffered no impairment of his spine and that he could return to full duty. Both Dr. Bethea and Dr. Bell believed that Smith's subjective complaints were out of line with the objective findings.

In 1990, the South Carolina Vocational Rehabilitation Department (VRD) performed a functional vocational evaluation of Smith. In the evaluation, VRD recommended that, because of his back injuries, Smith should avoid, *inter alia,* excessive climbing, stooping, bending, carrying, and lifting. On a scale of one to six, VRD rated Smith's general education development levels as very low, giving him a score of two in reasoning and math, and a score of one in language. VRD reported that Smith had "limited reasoning, academic, and intellectual skills," and that his inability to read "may hinder employability." VRD also noted that Smith had no work experience other than construction and building maintenance. Nonetheless, VRD found Smith's vocational prognosis to be favorable, given his good mechanical and maintenance skills.

In January 1991, Dr. Weston reported that Smith had reached maximum medical improvement and that he suffered a 3% impairment to his spine. Dr. Weston performed a functional capacities evaluation of Smith, and concluded that Smith should have assistance lifting more than 25 pounds, but that he could occasionally lift 25 to 60 pounds. Dr. Weston also found that, in a given work day, Smith was limited in the length of time he could sit, stand or walk continuously, and that Smith could only occasionally bend, squat, climb or reach.

In October 1991, Dr. Oliver found that Smith had reached maximum medical improvement and that he suffered a 5% permanent partial impairment to his spine.

---

least in part, his injuries. DMH records state that Smith was terminated the second time "due to his disability."

In April 1992, Smith began working four hours a day as a "trades helper." DMH created the trades helper position for Smith as part of an agreement Smith and DMH entered into in settlement of DMH's 1991 application to stop payment of the temporary benefits it had been paying Smith as a result of his 1989 injuries.

On August 25, 1992, while working as a trades helper, Smith injured his back a third time when his leg gave way and he fell into a ditch. After Smith's 1992 injury, Dr. Pakalnis found that Smith had reached maximum medical improvement and sustained a 4% permanent impairment to his spine. Based on the impairment to his spine, she restricted Smith to carrying no more than 28 pounds, pushing no more than 21 pounds, and pulling no more than 15 pounds.

Smith never returned to work after the 1992 injury. There is some dispute as to whether there is a position for Smith at DMH that he is qualified to perform, given his medical restrictions and physical limitations.

At a hearing held in March 1993, DMH sought to terminate its payment to Smith of temporary partial disability benefits on the ground that Smith had reached maximum medical improvement. Smith argued that DMH was not entitled to stop payment of his benefits because it had not shown that a suitable job was available for Smith. He also argued that he had not reached maximum medical improvement, or, alternatively, that in light of his work history and his mental and physical limitations, his back injury rendered him totally and permanently disabled.

On August 19, 1993, the single commissioner issued an order finding that Smith had reached maximum medical improvement and that DMH was entitled to stop payment of Smith's temporary partial disability payments. The single commissioner determined that Smith had suffered a 35% permanent disability to his back. Smith appealed to the full Workers' Compensation Commission. The Commission reduced the percentage of disability to Smith's back from 35% to 12%, but otherwise affirmed the findings of the single commissioner. The circuit court affirmed the Commission's order.

## II.

On appeal, Smith argues that DMH should not have been allowed to proceed on its stop-payment application because DMH had not complied with the statutory and regulatory requirements of the Workers' Compensation Act (the Act). We disagree.

In accordance with the mandate of S.C.Code Ann. § 42–9–260,[2] regulations 67–504 and 67–507 set forth the procedure for suspending or terminating workers' compensation benefits. Regulation 67–504 provides, in part:

A. An employer's representative shall neither reduce, suspend, nor terminate temporary total or temporary partial compensation benefits except as provided in this regulation or R. 67–507.

B. Disability is presumed to continue until the employee is able to return to work without restriction for fifteen calendar days or fifteen calendar days from the date the claimant agrees he or she was able to return to work.

C. When the claimant reaches maximum medical improvement and the authorized health care provider reports the claimant is able to return to work without restriction to the same job or other suitable job, and such a job is provided by the employer, or the claimant agrees he or she is able to return to work without restriction, the employer's representative may suspend compensation benefits by complying with section D below.

D. Prepare a Form 17, Receipt for Compensation, and, if all compensation payments are current, the employer's representative may:

(1) Suspend temporary compensation benefits during the fifteen day period in subsection D(2) below; and

---

2. The version of section 42–9–260 in effect at the time of Smith's hearing directed the Commission to "provide by rule the method and procedure by which benefits may be suspended or terminated for any cause, but such rule must provide for an evidentiary hearing and Commission approval prior to termination or suspension unless such prior hearing is expressly waived in writing by the recipient." S.C.Code Ann. § 42–9–260 (Supp.1992). Section 42–9–260 was completely revised in 1996. *See* S.C.Code Ann. § 42–9–260 (Supp.1996).

(2) Submit the Form 17 to the claimant for his or her signature after the claimant has returned to work without restriction for fifteen calendar days or fifteen calendar days from the date the claimant agreed he or she was able to return to work without restriction.

(3) When the claimant signs the Form 17, compensation benefits may be terminated by filing with the Commission's Claims Department the signed Form 17 no later than thirty-one days from the date the claimant returned to work or agreed he or she was able to return to work. Failure to file a Form 17 within thirty-one days from the date the claimant returned to work or agreed he or she was able to return to work may result in an assessment of a fine against the employer's representative.

E. If the claimant completes fifteen calendar days of work but refuses to sign a Form 17, the employer's representative may file a Form 21 according to R. 67–507E.

. . . . .

25A S.C.Code Ann.Regs. 67–504 (1990 & Supp.1996).

Focusing on the language of 67–504(C), Smith argues that temporary benefits cannot be terminated unless the employee is able to return to work without restriction and the employer provides a suitable job for the employee. Accordingly, because Smith had not been released to return to work without restriction and because DMH did not provide him with a suitable job, Smith contends DMH should not have been allowed to terminate his temporary benefits. We disagree.

A review of Regulation 67–504 in its entirety makes clear that the regulation governs the *voluntary* suspension and termination of benefits in situations where the employee returns to work without restriction or agrees that he is capable of returning to work without restriction. 25A S.C.Code Ann. Regs. 67–504(C) & (D)(3); *see also* Sarah Ellis McKay, Note, *The Proper Procedure for Suspending and Terminating Temporary Total Benefits*, 48 S.C.L.Rev. 235 (1996). Smith, however, was never capable of returning to work without restriction, nor did he ever agree he could return to work without restriction; thus, Regulation 67–504 simply is not applicable to this case.

█ Instead, the termination of Smith's benefits must be governed by Regulation 67–507, which sets forth the procedure for *involuntary* termination of workers' compensation benefits. Regulation 67–507 provides, in pertinent part:

A. The employer's representative shall neither reduce, suspend, nor terminate temporary total or temporary partial compensation benefits except as provided in this regulation or R. 67–504.

B. Disability is presumed to continue until the employee returns to work.

C. The employer's representative may request a hearing for permission to terminate compensation benefits by:

(1) Preparing a Form 21, Employer's Request for Hearing, stating the reasons supporting termination of compensation and signing the form; and

(2) Filing with the Form 21 an updated Form 18 indicating compensation payments are current. If not previously filed, a Form 15 and Form 20 must be filed; and

(3) Attaching the following to the Form 21:

(a) A medical certificate of the authorized health care provider stating the claimant has reached maximum medical improvement; or

(b) A medical certificate of the authorized health care provider stating the claimant is able to return to the same or other suitable job, an impairment rating, if any, and an affidavit of the employer that the same or other suitable job has been provided to the claimant; or

(c) A medical certificate of the authorized health care provider stating the claimant is unable to return to the same or other suitable job and an impairment rating; or

(d) A medical certificate of the authorized health care provider stating the claimant refuses medical treatment.

. . . . .

25A S.C.Code Ann.Regs. 67–507 (1990). Because the provisions of 67–507(C)(3) are disjunctive, temporary benefits may be terminated if the employer complies with any *one* of its requirements. Thus, if the employer can establish under 67–507(C)(3)(a) that the employee has reached maximum medical

improvement, it may terminate the employee's benefits without regard to whether the employee can return to work without restriction or whether the employer has provided a suitable job for the employee. *See Morgan v. JPS Automotives,* 321 S.C. 2012, 467 S.E.2d 457 (Ct.App.1996) (rejecting employee's argument that temporary benefits should not have been terminated because she had not been released to work without restriction, given that employer provided evidence that the employee had reached maximum medical improvement), *cert. dismissed as improvidently granted,* 486 S.E.2d 263 (1997); *O'Banner v. Westinghouse Elec. Corp.,* 319 S.C. 24, 27, 459 S.E.2d 324, 326 (Ct.App.1995) (Regulation 67–507 "unambiguously allows the employer to attach only a medical certificate stating the claimant has reached [maximum medical improvement] to support its stop payment application."); *Brown v. Owen Steel Co.,* 316 S.C. 278, 281, 450 S.E.2d 57, 59 (Ct.App.1994) (finding termination of temporary benefits to be proper where employer established that employee reached maximum medical improvement, notwithstanding fact that employee had not and could not return to work without restriction), *cert. denied,* (May 18, 1995).[3]

In this case, DMH attached to its request for a hearing a medical certificate establishing that Smith had reached maximum medical improvement, thus satisfying the requirements of Regulation 67–507(C)(3)(a). Accordingly, DMH was entitled to proceed on its stop-payment application.

Smith, however, contends that a claimant with an impairment rating and restrictions on the work the claimant is able to perform can never be said to have reached maximum

---

3. In *Adams v. Rice Services,* 313 S.C. 488, 443 S.E.2d 391 (1994), one of the cases relied upon by Smith, the Supreme Court concluded that the employer was not entitled to stop payment of the employee's temporary benefits because there was no evidence that the employee was able to return to the same or suitable job. *Adams,* 313 S.C. at 489–90, 443 S.E.2d at 392. In *Adams,* however, the Court was analyzing the employer's compliance with Regulation 67–10, which has been superseded by Regulations 67–504 and 67–507. Regulation 67–10 provided that "a request for permission to discontinue compensation payments.... shall be accompanied by a proper medical certificate to certify that the employee is able to return to the same or other suitable job, and that such job has been provided by the employer." 25A S.C.Code Ann.Regs. 67–10 (1989). Given the current requirements of Regulation 67–507, *Adams* does not control our resolution of this issue.

medical improvement; thus, DMH could not properly terminate his payments under Regulation 67–507(C)(3)(a). Because DMH did not comply with the requirements of subsections (C)(3)(b) or (c), Smith argues that DMH was not entitled to terminate his compensation payments. We find this argument to be without merit.

 "Maximum medical improvement is a term used to indicate that a person has reached such a plateau that in the physician's opinion there is no further medical care or treatment which will lessen the degree of impairment." *O'Banner,* 319 S.C. at 28, 459 S.E.2d at 327. Thus, the fact that a claimant may have some degree of permanent impairment does not prevent the claimant from ever reaching maximum medical improvement.[4] *See Swinton v. South Carolina Dep't of Mental Health,* 314 S.C. 202, 442 S.E.2d 215 (Ct.App.1994) (conclusion that claimant has reached maximum medical improvement does not amount to a conclusion that claimant's disability has ended). In this case, because DMH produced a medical certificate establishing that Smith had reached maximum medical improvement, DMH, pursuant to Regulation 67–507(C)(3)(a), was entitled to a hearing on its request to terminate its payments to Smith.

 Finally, Smith argues that, without regard to the regulatory requirements, the Act itself provides that compensation benefits may be stopped only if the employer offers or procures suitable employment for the employee. *See U.S. Outdoor Advertising, Inc. v. South Carolina Dep't of Transp.,* 324

---

4. According to Smith, however, construing "maximum medical improvement" under Regulation 67–507(C)(3)(a) as extending to situations where the employee has an impairment would render 67–507(C)(3)(b) meaningless, because "there is no fact situation in which [subsection (C)(3)(b) applies] that the Claimant has not reached maximum medical improvement." Again we disagree. Subsection (C)(3)(b) allows for the termination of temporary benefits if the employer provides a medical certificate establishing that the employee is capable of returning to the same or other suitable job and an affidavit establishing that the employer has provided a job for the employee. 25A S.C.Code Ann.Regs. 67–507(C)(3)(b). Depending on the nature of the employee's injuries and the particular job held by the employee, there clearly are situations where the employee has not yet reached maximum medical improvement but nonetheless is able to return to his job. For example, a switchboard operator who broke his leg on the job could likely return to work well before his leg is completely healed.

S.C. 1, 481 S.E.2d 112 (1997) (While regulations have the force of law, they may not alter or add to the terms of a statute.). Again we disagree.

As noted above, S.C.Code Ann. § 42–9–260 authorizes the Commission to adopt regulations setting forth the procedures for terminating benefit payments, and Regulations 67–504 and 67–507 comply with this directive. Smith, however, contends the regulations conflict with section 42–9–190 of the Act, which provides that "[i]f an injured employee refuses employment procured for him suitable to his capacity and approved by the Commission[,] he shall not be entitled to any compensation at any time during the continuance of such refusal." S.C.Code Ann. § 42–9–190 (1985). According to Smith, section 42–9–190 *requires* an employer to find suitable employment before it can terminate an employee's payments. We disagree. As we read the statute, it imposes no requirement on an employer to offer suitable employment, but instead simply provides that if the employer *does* offer the employee a position consistent with the employee's physical capacity, the employee is not entitled to benefits for any period during which he refuses the employment. Accordingly, the provisions of Regulation 67–507 are not inconsistent with section 42–9–190.

*Coleman v. Quality Concrete Products, Inc.*, 245 S.C. 625, 142 S.E.2d 43 (1965), which Smith contends supports his argument, does not change our analysis. In *Coleman*, the claimant was a 58 year-old man with a sixth grade education whose entire work history consisted of relatively low-skilled jobs. Although the claimant conceded he was not totally disabled from a medical or physical standpoint, he argued he was totally disabled because his injury prevented him from obtaining any job for which he was qualified. 245 S.C. at 628–29, 142 S.E.2d at 44. The Supreme Court, finding that the claimant had sufficiently established that his inability to find employment was a result of his injury, reinstated the Commission's finding of temporary total disability. *Id.* at 631, 142 S.E.2d at 45. The Court, citing the predecessor to S.C.Code Ann. § 42–9–190, then noted that the employer could be relieved of its payment obligation if it offered or procured a suitable job for the employee. *Id.* at 632, 142 S.E.2d at 46.

Contrary to Smith's argument, we do not believe that the passing reference in *Coleman* to the employer's ability to terminate payments by procuring a job for the claimant amounts to a holding that the *only* way an employer can terminate compensation payments is to procure a job for the employee. Moreover, even if, under prior versions of the Act and applicable regulations, the employer was required to procure employment for the employee before payments could be terminated, such a requirement does not exist under the current Act, in view of Regulation 67–507's valid authorization for the termination of payments when the claimant reaches maximum medical improvement.[5]

## III.

Smith also argues on appeal that he was deprived of his due process rights to a full hearing when the single commissioner stopped the hearing. Under the particular circumstances of this case, we agree.

After approximately two hours of testimony, the single commissioner refused to permit any further evidence to be presented by the attorneys. The commissioner indicated that much of the evidence already presented was irrelevant or immaterial, stating "I feel ... sometimes during this proceeding that we missed the issue and perhaps we didn't come as close as when the relief troops were dropping food in Bosnia and Croatia." The commissioner then called Smith to the stand and questioned him about his injuries and his ability to work. The commissioner did not allow Smith's attorney or DMH's attorney to question Smith. While the commissioner did allow the parties to proffer, in written form, a summary of the evidence they would have elicited from their witnesses had the hearing continued, he stated that he would not consider the proffered testimony, but that it would be included in the record for appellate review.

---

**5.** We note that, after the 1996 amendments, section 42–9–260 provides that "[i]f an employee has been declared as having reached maximum medical improvement, the employer may request a hearing to address the termination of temporary disability payments." S.C.Code Ann. § 42–9–260 (Supp.1996).

Section 1–23–330 of the Administrative Procedure Act provides that, in contested cases, "[i]rrelevant, immaterial or unduly repetitious evidence shall be excluded. . . . Subject to these requirements, when a hearing will be expedited and the interests of the parties will not be prejudiced substantially, any part of the evidence may be received in written form." S.C.Code Ann. § 1–23–330(1) (1986).

Clearly, section 1–23–330 gives the commissioner discretion to limit or exclude irrelevant testimony. To the extent that the evidence presented at the hearing was irrelevant,[6] the proper course under section 1–23–330 would have been to cut off the testimony when it became irrelevant, but to allow the other witnesses to testify. If those witnesses began testifying about irrelevant matters, their testimony likewise could have been limited. In this case, however, the commissioner allowed what he believed to be irrelevant evidence to be presented, and then refused to allow the testimony of other witnesses with relevant information. While the commissioner allowed the parties to present written summaries of the excluded testimony, he refused to consider it. Clearly, this is not the procedure envisioned by section 1–23–330.

Moreover, contrary to DMH's argument, we cannot conclude that Smith was not prejudiced by the closing of the hearing. The single commissioner stated in his order that "[w]hile I believe that Mr. Smith was honest concerning some of his complaints, I cannot overlook all of the objective medical evidence indicating a lack of objective findings to support all of

---

6. It appears that much of Smith's evidence focused on DMH's treatment of Smith (particularly the two terminations and subsequent reinstatements), and was intended to show that DMH had a practice of terminating disabled employees rather than finding work for them within their capabilities. While we are troubled by these allegations, we do not believe those issues were strictly relevant to the matter before the commissioner—whether DMH was entitled to discontinue the disability payments being made to Smith. Any claims of a retaliatory discharge based on Smith's workers' compensation claims or of DMH's obligation to reasonably accommodate any disability are matters that must be resolved in state or federal court, not before the Workers' Compensation Commission. *See, e.g.*, S.C.Code Ann. § 41–1–80 (Supp. 1996) (Any employer who discharges or demotes an employee because the employee in good faith filed a workers' compensation claim "is liable in a civil action for lost wages suffered by an employee as a result of the violation.").

his subjective complaints." Thus, the commissioner apparently concluded that Smith was exaggerating the severity of his injuries. Much of the medical evidence upon which the single commissioner relied, however, was more than two years old at the time of the hearing. Had the commissioner allowed Smith's attorney to present Smith's testimony, his attorney could have better elicited from Smith an accurate description of the impact of his injuries and the extent of his physical capabilities. In addition, the excluded testimony of the friends and relatives of Smith would have corroborated Smith's testimony concerning the impact of his injuries, and thus may have affected the conclusion that Smith was exaggerating the extent of his injuries.

More importantly, allowing Smith's attorney to question him likely would have given the single commissioner and the Commission a different understanding of the type of work Smith was actually capable of performing after his injuries. Smith argued below and argues again on appeal that, given his intellectual limitations and the fact that his work history consists solely of manual labor, the impairment to his back rendered him totally and permanently disabled. *See, e.g., Stephenson v. Rice Servs., Inc.,* 323 S.C. 113, 118, 473 S.E.2d 699, 702 (1996) ("Employees who because of a work-related injury can perform only limited tasks for which no reasonably stable market exists are considered totally disabled notwithstanding their nominal earning capacity."); *Coleman,* 245 S.C. at 628, 142 S.E.2d at 44 ("Disability in compensation cases is to be measured by loss of earning capacity. Total disability does not require complete helplessness. Inability to perform common labor is total disability for one who is not qualified by training or experience for any other employment."); *Colvin v. E.I. Du Pont De Nemours Co.,* 227 S.C. 465, 474–75, 88 S.E.2d 581, 585–86 (1955) (affirming a finding of total permanent disability in case where injury rendered employee incapable of performing manual labor, the only labor for which the employee was qualified). This position was supported by the testimony of Smith's vocational rehabilitation counselor, who stated that, given Smith's "background and all of his liabilities and no more skills than he has I don't think there is any other employer [other than DMH] that's going to hire him. But that's not to say that he can't occasionally do some self-

employment activity." The counselor further testified that, in her professional opinion, Smith was not employable in the competitive labor market.

The single commissioner, however, rejected this argument, noting Smith testified that he "could supervise a crew to do the type of work he did with the proper training, and the work that he knows how to do is building maintenance and plumbing." The single commissioner specifically rejected the evidence indicating that Smith was educable or mentally retarded, noting that Smith "did not have any problems understanding [the commissioner's] questions". and that "Mr. Smith's responses were forthright, intelligent, honest, and articulate."

Certainly, there is evidence in the record establishing that Smith is functioning at a higher level than that indicated by his high school records. However, there is also evidence that Smith *believes* he can function at a level higher than his actual performance and work history indicate. Had his attorney been able to elicit testimony from Smith, this difference in Smith's estimation of his abilities and his actual abilities would have been more apparent.

■■■ Administrative agencies are required to meet minimum standards of due process. S.C. Const. art. 1, § 3; *Stono River Environmental Protection Ass'n v. South Carolina Dept. of Health & Environmental Control,* 305 S.C. 90, 406 S.E.2d 340 (1991). In cases where important decisions turn on questions of fact, due process at least requires an opportunity to present favorable witnesses. *See, e.g., Brown v. South Carolina State Bd. of Educ.,* 301 S.C. 326, 391 S.E.2d 866 (1990); *Tall Tower, Inc. v. South Carolina Procurement Review Panel,* 294 S.C. 225, 363 S.E.2d 683 (1987). Accordingly, we conclude that the single commissioner improperly excluded testimony necessary for the Commission to make an informed decision, thus depriving Smith of his right to a full and fair hearing. *See* S.C. Const., art. 1, § 22 ("No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an *opportunity to be heard.*") (emphasis added). We therefore reverse the factual findings of the Commission relating to the amount of Smith's impairment and the percent-

age of any disability and remand for the taking of additional evidence.[7] On remand, the Commission at a minimum shall allow the parties to present the testimony of the previously excluded witnesses, and, most importantly, shall allow Smith to be examined by his attorney and the attorney for DMH. The Commission in its discretion may conduct a *de novo* hearing in which testimony from all witnesses is again taken, or the Commission may rely on the testimony previously given. Moreover, given the length of time that has elapsed since the original hearing, the Commission is free to order any additional medical or vocational evaluations of Smith as it deems proper.[8]

We recognize that the Commission is the sole fact-finder in workers' compensation cases, and that any questions of credibility must be resolved by the Commission. *See Hoxit v. Michelin Tire Corp.*, 304 S.C. 461, 463–65, 405 S.E.2d 407, 408–09 (1991) (The Commission is the sole fact-finder in workers' compensation cases; if there is a conflict in the evidence, the Commission's findings of fact are conclusive.); *Ross v. American Red Cross*, 298 S.C. 490, 492, 381 S.E.2d 728, 730 (1989) (In workers' compensation cases, it is the Commission that must make the final determination of witness credibility and the weight to be given evidence.). We simply

---

7. Although Smith argues that the Commission erred by not finding him to be totally and permanently disabled, we cannot say, on the record before us, that the Commission's finding of less than total disability is unsupported by substantial evidence. *See, e.g., Rodney v. Michelin Tire Corp.*, 320 S.C. 515, 519, 466 S.E.2d 357, 359 (1996) ("A court may not substitute its judgment for that of an agency as to the weight of the evidence on questions of fact unless the agency's findings are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record."). Accordingly, the extent of Smith's disability must be determined anew on remand, after Smith has the opportunity to fully present his case.

8. It appears that Smith never filed a Form 50 seeking compensation after his August 1992 injury. *See* S.C.Code Ann. § 42–15–40 (Supp. 1996) ("The right to compensation under this title is barred unless a claim is filed with the commission within two years after an accident."). We leave it to the Commission on remand to determine whether Smith's failure to timely file a claim might be excused, *see, e.g., Hopkins v. Floyd's Wholesale*, 299 S.C. 127, 382 S.E.2d 907 (1989), or whether evidence of an injury for which no claim has been filed might be otherwise admissible or relevant to the issues properly before the Commission.

conclude that, in this case, the improper exclusion of testimony by the single commissioner amounted to an error of law that deprived Smith of his right to present his case and deprived the Commission of the evidence it needed to make its findings of fact. *See* S.C.Code Ann. § 1–23–380(A)(6)(d) (Supp.1996) (In a workers' compensation case, a court may reverse or modify the Commission's decision "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are ... affected by other error of law.").

## IV.

In conclusion, we affirm the Commission's determination that, pursuant to 25A S.C.Code Ann. Regs. 67–507(C), termination of temporary benefits is proper upon a determination that the claimant has reached maximum medical improvement, without regard to whether the claimant has returned to work without restriction or whether the employer has made available to the claimant a suitable position. However, we reverse the findings of the Commission with regard to Smith's degree of impairment and disability and we remand this case to the Commission for the taking of additional evidence, in accordance with the instructions set out above.[9]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

HEARN and STILWELL, JJ., concur.

---

9. Given our resolution of this issue, we need not reach Smith's remaining appellate issues, and the Commission is free to consider those issues *de novo* should they arise on remand. However, as to Smith's challenge to the reduction by the Commission of the percentage of disability found by the single commissioner despite DMH's decision not to appeal the single commissioner's order, we refer the Commission to *Ham v. Mullins Lumber Co.*, 193 S.C. 66, 74, 7 S.E.2d 712, 716 (1940) ("[A]ll findings of fact and law by the Hearing Commissioner became and are the law of [the] case, except only those within the scope of the exception of defendant and the notice given to the parties by the Commission...."), and *Green v. City of Columbia*, 311 S.C. 78, 80, 427 S.E.2d 685, 687 (Ct.App.1993) ("Due process requires that litigants receive notice of the issues to be met on trial, hearing or appeal. Only issues within the application for review under S.C.Code Ann. § 42–17–50 (1976) are preserved for appeal to the commission.") (citations omitted).